IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NATIONAL INTERSTATE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | 1:11CV1074 |
| MORGAN & SONS WEEKEND TOURS, INC., CHARLES ALBERT MORGAN, JAMES PATRICK LOGAN, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This declaratory judgment action involves an insurance coverage dispute arising out of an insurance policy issued by Plaintiff National Interstate Specialty Insurance Co. ("Plaintiff" or "Plaintiff National") to Defendant Morgan & Sons Weekend Tours, Inc. ("Morgan & Sons"). The coverage dispute relates to a claim made by Defendant James Patrick Logan ("Logan") for personal injuries he suffered as a result of a traffic accident involving Morgan & Sons' president Charles Albert Morgan ("Defendant Morgan"). This matter is presently before the Court on a Motion for Summary Judgment filed by Plaintiff National [Doc. #38], and a Motion for Summary Judgment filed by Defendant Logan [Doc. #40]. For the reasons set out below, both motions should be denied at this time. However, the Court recommends that the trial in this case be stayed pending resolution of the underlying state court litigation, which involves overlapping factual and legal issues.

## I.     FACTS, CLAIMS, AND PROCEDURAL HISTORY

In this declaratory judgment action, Plaintiff National seeks to obtain a declaration that an insurance policy it issued to Defendant Morgan & Sons does not provide coverage for claims arising out of a traffic accident that occurred on March 17, 2011. On the morning of March 17, 2011, Defendant Charles Morgan was driving a 2000 Cadillac DeVille westbound on West Market Street in Greensboro, North Carolina. Defendant Patrick Logan was driving a motorcycle eastbound on West Market Street. The Cadillac being driven by Defendant Charles Morgan collided with Defendant Logan's motorcycle as Morgan was turning left into the business offices of Morgan & Sons Weekend Tours, Inc. ("Morgan & Sons") and C&W Bus Company ("C&W"). Defendant Logan was knocked off of his motorcycle and landed on the property of Morgan & Sons. He sustained serious injuries.

Defendant Morgan and his wife are the two principals of Morgan & Sons and are also the two principals of C&W. Defendant Morgan is the president of both C&W and Morgan & Sons. Morgan & Sons charters buses and tours and provides bus transportation for other local businesses. C&W is in the business of selling used cars. The Cadillac driven by Defendant Morgan was owned by C&W at the time of the accident. (DMV Doc. [Doc. #1-2].) On the morning at issue, Defendant Morgan left his home at approximately 6:30 a.m. to open the gate of Morgan & Sons so that the bus drivers could access their buses.

On August 5, 2011, Defendant Logan filed suit in Guilford County, North Carolina state court [No. 11CVS8678], against Defendant Morgan, C&W, and Morgan & Sons. As to Morgan & Sons, Defendant Logan alleged that Morgan & Sons was liable for Defendant Morgan's

2

negligence because Morgan was an employee of Morgan & Sons acting within the scope of his employment at the time of the accident. According to Defendant Logan, the state court action remains pending and "no rulings have been made" in that case. (Mem. [Doc. #41] at 4.)

Plaintiff National filed this declaratory judgment action in this Court on December 7, 2011, seeking a declaration that its insurance policy, CAR 0111751 09 ("the Policy"), issued to Morgan & Sons, does not provide coverage applicable to the claims of Defendant Logan for injuries Logan suffered or property damages allegedly caused by the negligence of Charles Morgan on March 17, 2011.[1] Defendant Logan has filed a counterclaim against Plaintiff National seeking a declaration that Plaintiff National is obligated to provide coverage under the National Interstate Commercial Auto Policy. Plaintiff National and Defendant Logan have now filed Motions for Summary Judgment. In its Motion [Doc. #38], Plaintiff National seeks summary judgment "determining that the Policy of Insurance issued by National Interstate does not provide coverage for Charles Albert Morgan, Sr. or for the vehicle operated by Charles Albert Morgan, Sr." on the date of the accident. Defendant Logan in his Motion [Doc. #40] seeks summary judgment that the insurance policy "provides coverage for the collision giving rise to this action."

---

[1] At the time of the accident, Penn National Insurance Company insured C&W under a garage policy for car dealers, covering those vehicles being sold by C&W. The Cadillac was also covered by an Auto Owners policy, in the names of Charles and Wilnette Morgan. Those policies are not the subject of the present dispute.

3

II.     MOTIONS FOR SUMMARY JUDGMENT

A.      Standard

Summary judgment is appropriate only when no genuine issue of material fact exists. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party.  Id.  The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact."  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  (Id. at 718-19 (citing Anderson, 477 U.S. at 247-48)).

In this diversity action, the Court applies North Carolina choice of law rules, and "[u]nder North Carolina's choice of law rules regarding the interpretation of insurance contracts, the principle of lex loci contractus mandates that the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract."  See Progressive Southeastern Ins. Co. v. Greene, 2008 WL 4170058 (M.D.N.C. 2008) (citing Fortune Ins. Co. v. Owens, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000)).  In the present case, both parties assume that the insurance policy must be interpreted under North Carolina law, and as it appears that the policy was delivered to Morgan & Sons in North

4

Carolina, it is reasonable to conclude that North Carolina law applies. In applying North Carolina law in this case, the Court notes that:

> North Carolina courts have outlined several principles of construction that guide courts in construing insurance policies. [See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 354, 172 S.E.2d 518, 522 (N.C. 1970).] As in other contracts, the aim of construction of policy terms is to arrive at the intent of the parties when the policy was issued. See id. This intent "must be found in the language used by the parties to the [policy]." Duke v. Mutual Life Ins. Co. of N.Y., 286 N.C. 244, 247, 210 S.E.2d 187, 189 (1974). "Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Woods v. Nationwide Mutual Insurance Co., 295 N.C. 500, 505-06, 246 S.E.2d 773, 777 (1978). Because the insurance company drafts the policy terms, any ambiguity as to their meaning "must be resolved in favor of the policyholder." Wachovia, 276 N.C. at 354, 172 S.E.2d at 522. Furthermore, in construing the provisions of an insurance policy, wherever possible the policy will be interpreted in a manner which gives, but never takes away, coverage. Nationwide Mut. Fire Ins. Co. v. Allen, 68 N.C. App. 184, 190, 314 S.E.2d 552, 555 (1984). Nevertheless, an ambiguity does not exist by virtue of the fact that the insured asserts a construction contrary to the construction offered by the insurance company. Wachovia, 276 N.C. at 354, 172 S.E.2d at 522. An ambiguity will exist only if "in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Id. (citation omitted).

Prime TV, LLC v. Travelers Ins. Co., 223 F. Supp. 2d 744 (M.D.N.C. 2002). With these principles in mind, the Court will first set out the policy provisions at issue in this case, and will then analyze these provisions in light of the evidence presented.

B.      Policy Provisions

There are three categories of Policy provisions at issue in this case: (1) the general provision of liability coverage; (2) the provisions as to who is an "insured" under the Policy; and (3) the provisions as to what vehicles are "covered autos" under the Policy.

1.      Liability Coverage

Section II of the Policy, "Liability Coverage," states that Plaintiff National:

will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'

(Id. at 13.)  Thus, the policy only covers amounts that an "insured" must pay as a result of the ownership, maintenance or use of a "covered auto."

2.      Provisions as to Who Is an Insured

Section II.A.1 of the Policy sets out who is an "insured."  Insureds under the Policy are:

a.      [Morgan & Sons][2] for any covered 'auto';

b.      Anyone else while using with [Morgan & Sons'] permission a covered 'auto' [Morgan & Sons] own[s], hire[s] or borrow[s] except:
   (1)    The owner or anyone else from whom you hire or borrow a covered 'auto'.  This exception does not apply if the covered 'auto' is a 'trailer' connected to a covered 'auto' you own.
   (2)    Your 'employee' if the covered 'auto' is owned by that 'employee' or a member of his or her household.
   (3)    Someone using a covered 'auto' while he or she is working in a business of selling, servicing, repairing, parking or storing 'autos' unless that business is yours.
   (4)    Anyone other than your 'employees,' partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower of any of the 'employees,' while moving property to or from a covered auto.
   (5)    A partner (if you are a partnership), or a member (if you are a limited liability company) for a covered 'auto' owned by him or her or a member of his or her household.

c.      Anyone liable for the conduct of an 'insured' described above but only to the extent of that liability.

---

[2] References to "You" and "Your" in the Policy are defined to refer to the Named Insured, which is Morgan & Sons.

6

Thus, under Paragraph (a), the Policy covers any amounts that <u>Morgan & Sons</u> legally must pay as damages because of an accident resulting from the ownership, maintenance or use of a "covered auto." In addition, under Paragraph (b), the Policy covers any amounts that "<u>anyone else</u>," including Charles Morgan individually, legally must pay as damages because of an accident resulting from the use of a "covered auto." However, this Paragraph (b) provides coverage only if Mr. Morgan was using a "covered auto" that Morgan & Sons hired or borrowed, and only if he was using it with the permission of Morgan & Sons. Paragraph (b) also sets out various exceptions that are the subject of dispute in this case. Finally, under Paragraph (c), the Policy covers "anyone liable for the conduct of an 'insured' described above."[3]

3.     Provisions as to What Constitutes a Covered Auto

According to Section I of the Policy, "Item Two of the Declarations shows the 'autos' that are covered 'autos'" under the Policy. Item Two, in turn, indicates that liability coverage of up to $5,000,000 per accident is provided for "Covered Auto Symbols 7, 8 and 9." Symbols 8 and 9 are in dispute.[4]

Symbol 8 covers "Hired 'Autos' Only," which are:

Only those 'autos' [Morgan & Sons] lease[s], hire[s], rent[s] or borrow[s]. This does not include any 'auto' [Morgan & Sons] lease[s], hire[s], rent[s] or borrow[s] from any of [its] 'employees,' partners (if you are a partnership), members (if you are a limited liability company) or members of their households.

---

[3] The Court notes that with respect to Paragraph (c), there is no contention in this case that a third party is potentially liable for the conduct of an insured, and to the extent Defendant Logan alleges that Morgan & Sons is vicariously liable for Defendant Morgan, any resulting liability of Morgan & Sons would appear to fall within the scope of Paragraph (a) if the Cadillac is a "covered auto," without resort to Paragraph (c).

[4] Symbol 7 covers the specific vehicles listed in Item Three of the Declarations, which consists of seven buses. The Cadillac driven by Defendant Morgan at the time of the accident is not listed in Item Three, and there is no contention in the summary judgment briefing that the Cadillac is a "covered auto" under Symbol 7.

7

Thus, Symbol 8 includes autos that Morgan & Sons has rented or borrowed. However, Symbol 8 excludes autos that Morgan & Sons borrows from its employees. Symbol 9 covers "Nonowned 'Autos' Only," which are:

> Only those 'autos' [Morgan & Sons] do[es] not own, lease, hire, rent or borrow that are used in connection with [Morgan & Sons'] business. This includes 'autos' owned by [Morgan & Sons'] 'employees,' partners (if you are a partnership), members (if you are a limited liability company),or members of their households but only while used in [Morgan & Sons'] business or [Morgan & Sons'] personal affairs.

Thus, Symbol 9 covers autos that are not owned, rented, or borrowed by Morgan & Sons, if the auto is "used in connection with" Morgan & Sons' business.[5] The Policy does not define "used in connection with."

In considering the parties' contentions regarding the Policy provisions, the Court will first analyze the evidence as to the "covered auto" provisions, and will then consider the provisions as to who is an "insured."

C.    Analysis of Covered Auto Provisions

Defendant Logan contends that the Cadillac was a "covered auto" at the time of the collision as defined by either Symbol 8 or Symbol 9 of the Policy. (Mem. [Doc. #41] at 7-12.) As noted above, Symbol 8 includes autos that Morgan & Sons has borrowed, but excludes autos that Morgan & Sons borrows from its employees. Defendant Logan argues that Symbol 8 covers the Cadillac driven by Defendant Morgan at the time of the accident because Defendant

---

[5] With respect to the coverage in Symbols 8 and 9 for vehicles not owned by Morgan & Sons, the Court notes that the Schedule of Coverage specifically includes a separate premium for "Non-Ownership Liability" for a business ("other than a social service agency") with between 1-25 employees, as well as for "Hired or Borrowed" covered auto liability. (Policy Schedule at 3.) Thus, a separate premium was charged for the risk associated with this additional coverage.

8

Morgan, acting as President of Morgan & Sons, borrowed the vehicle from its registered owner, C&W. (Mem. [Doc. #41] at 7-8.) In support of this contention, Defendant Logan relies upon the affidavit of Defendant Morgan. In his affidavit, Defendant Morgan states that:

> 9.    In my capacity as an officer and an employee of Morgan & Sons Weekend Tours, Inc., I borrowed the 2000 Cadillac from C&W Bus Company, Inc. on March 17, 2011 at approximately 6:15 am for the sole, specific and limited purpose of opening the gates of the business location of Morgan & Sons Weekend Tours, Inc. before normal business hours in order that employee bus drivers of Morgan & Sons Weekend Tours, Inc. could access their buses for a special early morning customer pick up.
>
> 10.    From the date C&W Bus Company first acquired title to the subject 2000 Cadillac until March 17, 2011, Morgan and Sons Weekend Tours, Inc., frequently and routinely borrowed that vehicle for its own business purposes. I attach hereto as Exhibit B my accounting of such borrowed use of the vehicle by Morgan and Sons Weekend Tours, Inc.

(Aff. Ex. D to Doc. #41.) The Exhibit B referred to by Defendant Morgan is a listing of the times that the Cadillac was used for Morgan & Sons business from 2001 until 2010. Defendant Morgan used the Cadillac, for example, to travel to bus auctions and bus shows in various states, to make trips to purchase bus parts for the Morgan & Sons fleet, and to travel to conduct business with the motor vehicles department in Raleigh, N.C., for the Morgan & Sons fleet of buses. (Id.) At his deposition, Defendant Morgan testified that the Cadillac was owned by C&W but was borrowed by Morgan & Sons at times for Morgan & Sons' business. (Dep. at 103-105.) Defendant Morgan testified that the gas in the Cadillac borrowed on the morning of March 17 was paid for by Morgan & Sons. (Dep. at 116.) In addition, Defendant Morgan

9

testified in his deposition that on the morning of March 17, his wife received a call that he needed to open the gate for Morgan & Sons, and that he borrowed the Cadillac to open the gate that morning in connection with Morgan & Sons' business. (Dep. at 84, 103-104). In this affidavit, Defendant Morgan notes that at the time of the accident, he was traveling to Morgan & Sons for the specific purpose of unlocking the gate for Morgan & Sons, and that he intended to return home, eat breakfast, and then prepare for his normal commute to work later that morning. (Aff. at Para. 6-7.)

In response, Plaintiff National first argues that "borrowing" implies communication with and permission from the property's owner, and that Defendant Logan has shown no such communication, permission, or intention by either C&W or Morgan & Sons. (Pl.'s Br. [Doc. #50] at 9.) Plaintiff cites two definitions of "borrow": the first from the Merriam-Webster Dictionary is "to receive with the implied or expressed intention of returning the same or an equivalent"; the second from Black's Law Dictionary is "to solicit and receive from another any article of property or thing of value with the intention and promise to repay or return it or its equivalent." (Id.) However, Plaintiff National does not cite any authority requiring any specific communication, permission, or intention to satisfy the provision for borrowing.

Courts that have discussed such "borrowing" language in similar insurance contracts have not required a specific formalized lending arrangement. See Metzger v. Country Mut. Ins. Co., Doc. No. 2-12-0133, 2013 WL 1153943 (Ill. App. Ct. Mar. 21, 2013) ("We note further that the definition of 'borrow' that we are using does not require that the lending arrangement be formalized, which apparently it was not here. Also, though the lending arrangement was,

10

apparently, continuous from the purchase of the Ford F-250 in 2007 to the accident in 2009, [the registered owner] retained title to the vehicle, implying that the business was still using it at his pleasure."); Gold v. Casserly Landscape, Inc., 801 P.2d 844 (Or. Ct. App. 1990), reconsideration allowed; opinion modified and adhered to as modified, 812 P.2d 33 (Or. Ct. App. 1991) (rejecting trial court's finding that frequency of use is a pertinent factor in determining whether a vehicle is "borrowed" under insurance policy provision, and finding that whether the business had "borrowed" the vehicle was "a question of fact about the intent of the parties"); American Indemnity Ins. Co. v. Code Elec. Corp., 760 P.2d 571, 574 (Ariz. Ct. App. 1988) ("[W]e hold that 'borrowing' does not require an agreement to return the property at a fixed or certain time. A 'borrowing' may be for an indefinite period and may last until either the borrower decides to return the property or the lender requests its return.") In this case, Defendant Morgan, as the president of Morgan & Sons, has stated in his affidavit that Morgan & Sons borrowed the Cadillac from C&W on the morning of March 17. Cf. Randall Insurance, Inc. v. O'Neill, 258 N.C. 169, 128 S.E.2d 239 (1962) (holding a business to the testimony of its president with respect to the business' authorization of the president's use of a vehicle). Defendant Morgan, who is also President of C&W, has likewise testified that C&W gave permission for Morgan & Sons to borrow the Cadillac that morning. (Morgan 2011 Dep. at 72.) Therefore, the Court cannot find as a matter of law that no "borrowing" occurred due to a lack of communication, permission or intention.

Plaintiff National next argues that it would have been unlawful for C&W to loan the Cadillac to Morgan & Sons, or for Morgan to make such a loan on C&W's behalf, because the

11

Cadillac carried "dealer" license plates, and in North Carolina it is unlawful to use dealer plates on vehicles operated for any other business than that in which the dealer is engaged. (Br. [Doc. #50] at 9.)[6] However, Plaintiff National fails to cite any authority to establish that such a violation prevents the vehicle from being a "borrowed" vehicle under the insurance contract. Defendant Logan points out that under the respondeat superior doctrine in North Carolina, the commission of an unlawful act does not necessarily preclude employer liability. See Estes v. Comstock Homebuilding Companies, Inc., 195 N.C. App. 536, 544-45, 673 S.E.2d 399, 404-05, (2009) ("[E]ven if it were proven that Ms. Haskell was not authorized to smoke, Comstock would still be liable under the doctrine of respondeat superior if she were in the scope of her employment while performing the act."); see also Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 340 S.E.2d 116 (1986) (noting that for purposes of vicarious liability, "[i]f the act of the employee was a means or method of doing that which he was employed to do, though the act be unlawful and unauthorized or even forbidden, the employer is liable for the resulting injury"). Moreover, there is no dispute that a violation of another traffic law, for instance, by speeding, or failing to keep a proper lookout, would not preclude coverage under the policy. Therefore, this alleged violation does not preclude a determination that the Cadillac was a "borrowed" vehicle.

---

[6] Under North Carolina General Statute § 20-79, a dealer license plate may not be displayed on a vehicle "used by the dealer in another business in which the dealer is engaged." Violation of this provision may result in a $100 fine for the individual driving the vehicle, a $250 fine for the dealer, and a potential rescinding of all of the dealer license plates issued to the dealer. N.C. Gen. Stat. § 20-79(d) and (e). Violation of this provision may also constitute negligence by the dealer, in this case C&W. See Johnson v. Skinner, 99 N.C. App. 1, 392 S.E.2d 634 (1990); Kraemer v. Moore, 67 N.C. App. 505, 313 S.E.2d 610 (1984) (noting that a dealer who lends plates in violation of the statute may be liable based on negligence per se if the violation is the proximate cause of the injury). However, Plaintiff National has not identified any basis to conclude that this alleged negligence by C&W would preclude coverage under the policy as a matter of law.

Finally, Plaintiff National mentions in passing that even if Defendant Morgan violated his duties to C&W and unlawfully borrowed the Cadillac, Symbol 8 does not provide coverage for a vehicle borrowed from an employee, which excludes Defendant Morgan. However, the Cadillac was indisputably owned by C&W. To the extent that the Cadillac was borrowed from C&W by Morgan & Sons, the exclusion would not apply.

The Court of Appeals for the Fifth Circuit considered a similar scenario in Ureta v. Thompson, 892 F.2d 426 (5th Cir. 1990). In that case, a doctor (Dr. Ureta) was killed in an automobile accident on his way to a birthday party, and his widow filed a claim against the insurer that issued a policy to a professional medical partnership (the Clinic), of which the doctor's professional medical corporation (Ureta APMC) was a partner. The Fifth Circuit noted that under the relevant policy,

> 'Hired autos' are defined in the policy as automobiles that 'you' hire, lease, or borrow. 'You' is defined in the policy as referring to the named insured, in this case Browne–McHardy Clinic. If, as Mrs. Ureta alleges, her husband was to perform Browne–McHardy business at the birthday party, then the vehicle in which he was driving could be considered a vehicle borrowed from Dr. Ureta by Browne–McHardy. As a borrowed automobile, it would be covered under the hired autos section of the USF & G policy. Thus, whether Dr. Ureta's car was, at the time of the accident, a covered vehicle under the 'hired autos' section of the policy, depends upon whether Dr. Ureta was to be engaged in Browne–McHardy business at the birthday party. That question presents a genuine issue of material fact precluding summary judgment.

Ureta v. Thompson, 892 F.2d at 429.

Likewise in the present case, there is evidence from which a jury could conclude that the Cadillac had been borrowed by Morgan & Sons from C&W at the time of the accident, and that the Cadillac was therefore a "covered auto" under Symbol 8 of the Policy.

13

However, that is not to say that a jury could only find that the Cadillac was a "covered auto" under Symbol 8. Defendant Morgan's testimony is that he borrowed the Cadillac in his capacity as an officer of Morgan & Sons. However, there is evidence that Defendant Morgan and his wife did not own personal vehicles and that Defendant Morgan used the Cadillac or other C&W vehicles for personal errands and vacations. Defendant Morgan testified that he and his wife sometimes borrowed the Cadillac, including on the evening before the accident. (Dep. at 117-118.) Ms. Morgan testified during her deposition that she normally drove a van back and forth to work and that the van was owned by C&W. (W. Morgan Dep. [Doc. #46-12] at 18-19.) There is also evidence that expenses for the Cadillac and other C&W vehicles, including expenses for gas, were paid from an account with both C&W and Morgan & Sons funds. The circumstances of Mr. Morgan's use of the vehicle, over many years and for personal errands as well as what may be found to be work-related trips, would provide a reasonable jury with a basis to conclude that he borrowed the vehicle personally rather than as an officer of Morgan & Sons. Therefore, the Court concludes that there are genuine issues of material fact with respect to whether the Cadillac was "borrowed" from C&W by Morgan & Sons. Given these unresolved issues, the Court cannot conclude as a matter of law that the Cadillac is - or is not - a "covered auto" under Symbol 8.

Defendant Logan further contends that if the Cadillac is not considered "borrowed" under Symbol 8, it is nevertheless a covered auto under Symbol 9 because at the time of the accident it was being used "in connection with" Morgan & Sons' business. (Mem. [Doc. #41] at 8.) On this point, the Court concludes that there may be some issue as to whether coverage

14

under Symbol 9 can be fully resolved as a matter of law, at least until the underlying state court proceedings have concluded. Under Symbol 9, "Nonowned Autos" are those that Morgan & Sons does not own, lease, hire, rent or borrow that are used in connection with its business. As noted above, the Policy does not define "used in connection with." The North Carolina Court of Appeals has concluded that use of a vehicle was "in connection with" a business where an employee of the business was using his motorcycle in the insured's business traveling between job sites. See Great American Ins. Co. v. Freeman, 192 N.C. App. 497, 665 S.E.2d 536 (2008). However, in Great American, the North Carolina Court of Appeals did not set out a test or analysis to use in determining whether the use was "in connection with" a business. A similar provision requiring use "in the business of" the insured was construed "using respondeat superior principles." MGM Transport Corp. v. Cain, 128 N.C. App. 428, 430, 496 S.E.2d 822, 824 (1998) (noting that in interpreting the insurance provision "the question is whether the driver is acting within the scope of the business of the lessee . . . at the time of the accident" and while it "is a general rule that an employee is not engaged 'in the business of' the employer while driving to and from the place of employment . . . . where the employee is acting at the direction of, or in the performance of some duty owed to, the employer when making the trip, the employee may be said to be acting in the scope of employment").

Other courts interpreting similar policy provisions have looked to two factors. "The first factor is the extent to which the vehicle at issue was used in the course and scope of the insured's business. . . . The second factor in determining whether use was "in connection with" the insured's business is the extent to which an insured held or exerted a right of control over

15

the vehicle and its driver." U.S. Fidelity & Guar. Co. v. Sanders, No. 5:03-0702, 2006 WL 771914 (S.D.W. Va. Mar. 23, 2006); see also Nuvell Nat'l Auto Finance, LLC v. Monroe Guar. Ins. Co., 736 S.E.2d 463, 469 (Ga. Ct. App. 2012) (quoting CMH Homes v. United States Fidelity & Guaranty Co., 2007 U.S. Dist. LEXIS 12795 (E.D. Tenn. 2007))). In interpreting a similar provision, the Court of Appeals for the Tenth Circuit noted that "[w]hile the policy does not formally define the 'in connection with' language, the non-owned auto provision itself supplies the most obvious example of coverage in its second sentence: privately-owned vehicles driven by [company] employees (or members of their household) in the course of [company] business or [company]-related personal affairs. . . . Viewing the 'in connection with' language in the context of the entire provision thus suggests that instead of covering all autos somehow related to [the company's] business, the policy is intended to apply to [company]-affiliated persons operating privately-owned vehicles while performing company-related work." Union Standard Ins. Co. v. Hobbs Rental Corp., 566 F.3d 950 (10th Cir. 2009). Consistent with this interpretation, the Fourth Circuit recently considered a similar provision under Virginia law and held that an employee driving his own automobile after business hours, while he was off duty and on his way back to his temporary housing after dinner and drinking with a co-worker, was "not acting on behalf of his employer at the time of the accident" and the automobile was not, in that situation, being used in the company's business or affairs. Pham v. Hartford Fire Ins. Co., 419 F.3d 286 (4th Cir. 2005). However, the Fourth Circuit in Pham did not specifically address the scope of the "in connection with" provision for an employee driving to work or on a work-related errand.

16

The parties in their briefing note the potential overlap with this determination and principles of respondent superior liability under state tort law. In this regard, the parties dispute whether Defendant Morgan was acting in the "course and scope" of his employment with Morgan & Sons at the time of the accident, and also dispute application of the "going and coming" and "special errand" doctrines that apply in the context of worker's compensation cases. See Powers v. Lady's Funeral Home, 306 N.C. 728, 295 S.E.2d 473 (N.C. 1982) (noting, in a worker's compensation case, that "[i]t is a general rule in this and other jurisdictions that an injury by accident occurring en route from the employee's residence to his workplace or during the journey home is not one that arises out of or in the course of employment. Equally as well recognized as the general rule is the 'special errand' exception, which permits coverage of the employee from 'portal to portal.'" (citations omitted)); Deseth v. LensCrafters, Inc., 160 N.C. App. 180, 585 S.E.2d 264 (2003) (holding in a worker's compensation case that "compensation is appropriate where an employee is injured while running a 'special errand' for an employer, [but] in those cases applying the special errand rule, the action undertaken by the employee bestowed some benefit upon the employer other than the employee merely coming to work."); Adkins v. Stilwell, 725 S.E.2d 923, 2012 WL 1995165 (N.C. App. June 5, 2012) (unpublished) ("[T]he issue of whether or not defendant Stilwell's commute to the Stoneville plant constituted a 'special errand' is irrelevant, because this exception, and the corresponding 'going and coming' rule, do not apply under the theory of respondeat superior."); see also Wilkie v. Stancil, 196 N.C. 794, 147 S.E. 296 (1929) (finding that respondeat superior liability would not apply with respect to injuries caused by an employee on the way to his place of employment to turn on the lights

on a holiday); Ellis v. American Service Co., 240 N.C. 453, 82 S.E.2d 419 (1954) ("An employee is not engaged in the prosecution of his employer's business while operating his personal car to the place where he is to perform the duties of his employment."); McLamb v. Beasley, 218 N.C. 308, 11 S.E.2d 283 (1940) ("As a general rule the servant is not in the course of his employment while going to and returning from his work."); Daniels ex rel. Webb v. Reel, 133 N.C. App. 1 515 S.E.2d 22 (1999) (finding a jury question as to the possibility of vicarious liability for a baseball team based on injuries caused by a volunteer who was driving team members to a game, and noting that "[a]lthough there can be an agency relationship only if the principal retains the right to control the manner of performance, driving to or from a work site at the direction of an employer has been considered to be within the scope of employment and sufficient to subject an employer to vicarious liability for an employee's negligent driving") (internal citations omitted); Evington v. Forbes, 742 F.2d 834 (4th Cir. 1984) (upholding a jury finding of vicarious liability and noting that "in North Carolina, as in most jurisdictions, the general rule is that travel to and from work is not within the scope of one's employment . . . [but] accidents in the course of regular duties or on a prescribed errand for the employer, although they may be on the way to or from work, are within the scope of employment"). The Court of Appeals for the Fourth Circuit has specifically noted that "in North Carolina, the scope-of-employment question is ordinarily one for the jury." Borneman v. United States, 213 F.3d 819 (4th Cir. 2000); see also Evington, 742 F.2d at 836-37 ("Where it is doubtful whether a servant in injuring a third person was acting within the scope of his authority, it has been said that the doubt will be resolved against the master because he set the servant in motion, at least to the extent of requiring the

18

question to be submitted to the jury for determination." (quoting <u>Cole v. Atlantic Coast Line R. Co.</u>, 211 N.C. 591, 191 S.E. 353, 355 (1937)).

In considering the parties' contentions on these issues, the Court notes that the determination of respondeat superior liability raises significant, disputed questions of state law that are directly at issue in the underlying state court suit in this case, in which Defendant Logan has asserted state tort claims against Morgan, Morgan & Sons, and C&W. Moreover, any determination of whether a vehicle was used "in connection with" Morgan & Sons business would raise legal and factual issues that would overlap with the determination of respondeat superior liability under state tort law, although the inquiry might not necessarily be identical. <u>See Lincoln General Ins. Co. v. Gateway Sec. Servs., Inc.</u>, No. 1:06CV1143, 2007 WL 3203020 n.3, *15-16 (E.D. Cal. Oct. 29, 2007) (noting that state law rules regarding respondeat superior liability would overlap with, but would not be identical to, the determination of whether an employee on her way to work was using a vehicle "in connection with" the business and in furtherance of the business or personal affairs of the employer). Thus, the Court concludes that any further resolution of whether the Cadillac was used "in connection with" Morgan & Sons business so as to render it a "covered auto" under Symbol 9 of the Policy would significantly overlap with the question of respondeat superior liability under state tort law, which is the issue raised in the underlying state court suit.

D. Analysis of "Insured" Provisions

Even if the Cadillac is a "covered auto" under either Symbol 8 or Symbol 9 of the Policy,[7] coverage is only provided for an "insured." As set out above, Section II.A.1 of the Policy sets out who is an "insured." Under Paragraph (a), Morgan & Sons is an "insured" for any covered auto. Thus, the Policy provides coverage for any liability of Morgan & Sons as long as the accident resulted from the use of a covered auto. Therefore, to the extent that the jury in this case may conclude that the Cadillac was a "covered auto" under either Symbol 8 or Symbol 9, the Policy provides coverage for any amounts that Morgan & Sons legally must pay. In their Summary Judgment briefing in this case, the parties undertake an extensive analysis of whether Morgan & Sons would be vicariously liable under state tort law for the vehicle accident

---

[7] The Court notes that Plaintiff National has also raised the contention that the Cadillac could not be considered a "covered auto" under the Policy because it was not disclosed on the application materials. In this regard, Plaintiff National notes that as part of the Application Materials, the Applicant "warrants and represents that all vehicles owned by, leased to, or used by the Applicant have been disclosed in the Application Materials or otherwise disclosed in writing to insurer, regardless of whether Applicant intends to schedule such vehicles on the policy issued by insurer." However, this representation only applies "[i]f the Applicant applies for a commercial auto policy that is not rated based on mileage, payroll, or other measure of exposure." The Application Materials further specifically provide that "[i]f Applicant applies for a commercial auto policy that is exposure rated, Applicant warrant and represent that all mileage, payroll, or other measure of exposure relating to Applicants operations have been disclosed in the Application Materials or otherwise disclosed in writing to insurer for all applicable periods of time." In the Policy itself, on the Schedule of Coverage, a separate premium was calculated for the risk associated with the additional coverage for "non-ownership liability" with a "rating basis" based on the number of employees, and a separate premium was calculated for the risk associated with the additional coverage for "hired or borrowed" autos with a "rating basis" based on the estimated cost of hire, which was noted as "if any." There is no contention that Morgan & Sons did not accurately disclose its number of employees or information that formed the basis for calculation of the premium for "non-ownership liability" or "hired or borrowed" auto liability coverage, and the parties have not addressed these provisions with respect to the application disclosure requirements raised by Plaintiff National. Moreover, the Policy itself includes a "misrepresentation" provision, but under that provision, the Coverage Form is only void in case of fraud by Morgan & Sons or intentional concealment or misrepresentation of a material fact by an insured, and pursuant to the separate North Carolina Changes, this condition would not apply for coverage up to the minimum limits of liability in North Carolina in any event. Plaintiff National has not attempted to declare the policy void under any of these provisions. In light of the information presently before the Court, the Court cannot find that the representations in the Application Materials would preclude coverage under the Policy as a matter of law.

20

on March 17, 2011. However, it appears that any determination of what amounts Morgan &

Sons "legally must pay" would be resolved in the underlying state court suit, and if the Cadillac

is a "covered auto," then the Policy provides coverage for any liability of Morgan & Sons.

Defendant Logan also contends that Defendant Morgan is an insured under Paragraph

(b). As discussed above, Paragraph (b) states that "[a]nyone else" is an insured "while using with

[Morgan & Sons'] permission a covered 'auto'" that Morgan & Sons owns, hires or borrows.

Under this provision, if the jury in the present case concludes that Morgan & Sons borrowed

the Cadillac from C&W, Defendant Morgan would also be an insured if he was using the

Cadillac with Morgan & Sons' permission. Plaintiff National nevertheless contends that two of

the exceptions in Paragraph (b) apply. Specifically, under exception (1), an "insured" does not

include anyone from whom Morgan & Sons hired or borrowed a covered auto. Under

exception (3), an "insured" does not include someone using a covered auto while he or she is

working in a business of selling, servicing, repairing, parking or storing autos unless that business

is Morgan & Sons'. (Policy [Doc. #1-1] at 13.) However, as to exception (1), if the jury in the

present case concludes that Morgan & Sons borrowed the Cadillac from C&W, then C&W itself

would not be an insured, but Defendant Morgan could still be an insured, as long as the Cadillac

was borrowed from C&W and not from Defendant Morgan. As to exception (3), it is not

disputed that the Cadillac bore dealer tags and that it was owned by C&W, which is a business

involved in selling cars. However, the evidence would allow a reasonable jury to conclude that

Morgan & Sons borrowed the vehicle on multiple occasions for Morgan & Sons' business, that

Defendant Morgan's purpose in driving the vehicle at the time of the accident was to open the

21

gate so that Morgan & Sons drivers could access their buses, and that in that capacity Defendant Morgan was not working in a business of selling autos. Therefore, the Court cannot determine as a matter of law that at the time of the accident Defendant Morgan was working in a business of selling autos so as to exclude him as an "insured" under Paragraph (b).[8]

The Court therefore concludes that summary judgment should not be granted in favor of either Plaintiff National or Defendant Logan at this time. Factual issues remain as to whether the Cadillac being driven by Defendant Morgan was a "covered auto" under the Policy and whether Defendant Morgan is an insured under the Policy.

## III.    STAY OF DECLARATORY JUDGMENT TRIAL

Having concluded that summary judgment is not appropriate at this time, the Court notes that the underlying state court case involves legal and factual issues that overlap with the issues raised in this case, but none of the parties in this case have addressed the appropriateness of proceeding to a trial in this declaratory judgment action while the underlying state action remains pending. "The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that district courts 'may declare' the rights of interested parties. This permissive language has long been interpreted to provide discretionary authority to district courts to hear declaratory judgment cases." United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 493 (4th Cir. 1998). A declaratory judgment "is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Centennial Life Ins. Co. v. Poston, 88 F.3d 255,

---

[8] The Court notes that these exceptions are not general policy exclusions, and are only exceptions to the definition of an "insured" in Paragraph (b).

256 (4th Cir. 1996) (quoting <u>Aetna Cas. & Sur. Co. v. Quarles</u>, 92 F.2d 321, 325 (4th Cir. 1937)). However, when a parallel proceeding is pending in state court, district courts must also take into account "considerations of federalism, efficiency, and comity." <u>Nautilus Ins. Co. v. Winchester Homes, Inc.</u>, 15 F.3d 371, 376 (4th Cir. 1994).

"To aid district courts in balancing the state and federal interests when a parallel state action is pending, we have articulated four factors for consideration: (1) whether the state has a strong interest in having the issues decided in its courts; (2) whether the state courts could resolve the issues more efficiently than the federal courts; (3) whether the presence of 'overlapping issues of fact or law' might create unnecessary 'entanglement' between the state and federal courts; and (4) whether the federal action is mere "procedural fencing," in the sense that the action is merely the product of forum-shopping." <u>Kapiloff</u>, 155 F.3d at 493-94.

In the present case, consideration of this declaratory judgment action could "serve a useful purpose" in resolving at least some of the disputed coverage issues under the insurance policy. Indeed, "[i]t is well established that a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism." <u>Kapiloff</u>, 155 F.3d at 494. Therefore, the Court has proceeded in this case and has specifically addressed above the coverage issues that are distinct from the issues raised in the underlying state court suit. However, "considerations of federalism, efficiency, and comity" must be considered at this point, particularly to the extent that any trial in this case would involve factual issues that would necessarily overlap with factual issues raised in the underlying state court suit. These issues include, in particular, the issue of whether Defendant Morgan was acting in the course and scope

23

of his employment at the time of the accident. Resolution of this issue involves disputed questions of state tort law that would require this Court to predict the rule that the North Carolina Supreme Court would adopt. Given these state law issues, the North Carolina state courts would have a significant interest in resolving these disputed questions of state tort law. Moreover, resolution of the issues in this case could potentially infringe upon that determination, but would not necessarily resolve those state tort law issues. In similar circumstances involving potential vicarious liability under state tort law and a "nonowned auto" insurance coverage provision, the United States District Court for the District of Kansas concluded that the federal declaratory judgment action should be stayed pending resolution of the overlapping issues of state tort law in the underlying state court proceeding, in order to avoid friction between the state and federal courts. See Continental Western Ins. Co. v. Robertson Tank Service, Inc., No. 12-1087, 2013 WL 1447067 (D. Kan. Apr. 9, 2013) (noting that, with respect to a "nonowned auto" coverage provision, a determination of whether an employee's use of a vehicle was "in connection with" the employer's business was "intertwined with" the question of vicarious liability, which was an issue before the state court and presented overlapping fact issues, and as such the federal declaratory judgment action was appropriately stayed until the "state court has definitively ruled on the question of liability"). Therefore, given the overlapping factual issues, the potential for a jury trial in this Court that would require determination of factual issues that could infringe upon the state court proceedings, the resulting potential for unnecessary entanglement between state and federal courts, the state court interest in resolving disputed and evolving issues of state tort law, and the fact that state tort law issues would remain unresolved

24

even if this case proceeded, this Court recommends that this case be stayed pending determination of the underlying liability issues in state court. Defendants will be directed to file a notice when the state court action has concluded. The Court notes that because the resolution in state court may affect the issues remaining in this Court, the parties may, upon the lifting of the stay in the present case, seek leave to file supplemental dispositive motions based upon the state court's resolution of the matters before it.

The Court also notes that Defendant Logan filed a Suggestion of Subsequently Decided Authority [Doc. #53], and Plaintiff Nation filed a Motion to Strike [Doc. #55] seeking to strike the suggestion of subsequently decided authority. The Court has considered the parties' submissions and concludes that the Defendant Logan's subsequently decided authority would not affect this Court's analysis in any event. Therefore, the Motion to Strike will be denied as moot.

Finally, the Court notes that Plaintiff National's Complaint sought a declaration as to coverage under the policy, which was the subject of the parties' summary judgment briefing addressed above, but the Complaint also sought a declaration as to whether Plaintiff National was obligated to defend Defendant Charles Morgan or Morgan & Sons under the Policy in the underlying state court action. Plaintiff National has not separately addressed this issue in its summary judgment briefing, and instead focused on the question of whether coverage exists under the terms of the Policy. To the extent that Plaintiff National initially raised a question regarding its duty to defend, the Court notes that in North Carolina, an insurer has a duty to defend as long as the facts alleged in the pleadings are "arguably covered by the policy." Waste

25

Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 692, 340 S.E.2d 374, 378 (1986); see

Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C., 364 N.C. 1, 6-7, 692 S.E.2d 605,

610-11 (2010) (explaining that the duty to defend is broader than the duty to indemnify because

an unsubstantiated allegation requires an insurer to defend against it so long as the allegation is

of a covered injury).  In light of the allegations of Plaintiff Logan's underlying state court action,

and in light of the discussion above, it appears that Plaintiff National Interstate would have a

duty to defend in the underlying suit, as the claims are at least "arguably covered by the policy."

It does not appear that Plaintiff National contends otherwise at this point, at least in the

summary judgment briefing, and no party has sought a separate summary judgment on this issue.

The Court raises this issue to note that any stay of this case would be a stay only as to the

determination of the duty to indemnify.  To the extent any party still contests and seeks an

immediate determination on the duty to defend not otherwise resolved in this Recommendation,

the stay would not preclude further briefing on that issue.

 In order to allow the parties sufficient time to respond to this Recommendation, the

Court will direct that this case be removed from the October Trial Calendar, and any trial will

be reset as further directed by the Court after consideration of any objections and responses.

IV.    CONCLUSION

For the reasons set out above,

IT IS ORDERED that Plaintiff National's Motion to Strike [Doc. #55] is DENIED AS MOOT.

IT IS RECOMMENDED that Plaintiff National's Motion for Summary Judgment [Doc. #38] be denied, and that Defendant Logan's Motion for Summary Judgment [Doc. #40] be denied.

IT IS FURTHER RECOMMENDED, however, that any trial in this declaratory judgment action be stayed pending final determination of the liability issues in the underlying state court suit, and Defendants should file a Notice with this Court upon conclusion of the state proceedings.

IT IS ORDERED that this action be removed from the October Trial Calendar, to allow the parties sufficient opportunity to file Objections and Responses.

This, the 27th day of September, 2013.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge